UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

TOTAL MANAGEMENT SYSTEMS, INC.,  )
a New Mexico Corporation,                         )
                                                                      )
                                    Plaintiff,                     )
                                                                      )
vs.                                                                  )      No.  CIV-01-1220-BB/RHS
                                                                      )
GENERAL GROWTH PROPERTIES, INC.,  )
a foreign corporation doing business in           )
New Mexico,                                                   )
                                                                      )
                                    Defendant.                   )
vs.                                                                  )
                                                                      )
TOM SUNDARAM and PRAKASH                 )
SUNDARAM,                                                    )
                                                                      )
                                    Cross-Defendants.        )
_____ )

03 JUN 20  PH 4: 15

**DEFENDANT GENERAL GROWTH PROPERTIES, INC.'S**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Defendant General Growth Properties, Inc. ("General Growth") hereby provides its

proposed findings of fact and conclusions of law regarding the claims brought by Plaintiff Total

Management Systems, Inc. ("TMS") and its principals, Tom and Prakash Sundaram ("the

Sundarams"). These findings of fact and conclusions of law address the two equitable claims,

promissory estoppel (Count I) and unjust enrichment (Count V), which will be tried by the

Court. They also address various questions of law which are matters to be decided by the Court,

whether before or at trial.

## I. AMENDED COMPLAINT -- COUNT I

### A.   Breach of Contract and Breach of the Duty of Good Faith and Fair Dealing

#### 1.   Findings of Fact

1.     Through its Vice President Prakash Sundaram, TMS sought to lease from General Growth a parcel of land known as "B-4" at Rio West Mall.

2.     On May 17, 2001, Prakash Sundaram submitted what he titled a "letter of intent" to General Growth setting forth some of the terms under which TMS proposed to lease the B-4 property.

3.     On June 4, 2001, General Growth (via its agent Jeff Aronoff) faxed a response to TMS. The response consisted of handwritten inter-lineations to TMS's May 17th "letter of intent."

4.     On June 28, 2001, Prakash Sundaram wrote to Aronoff requesting additional information regarding the B-4 parcel.

5.     On July 25, 2001, TMS sent a "revised proposal" to Aronoff outlining different terms for the proposed ground lease of the B-4 parcel. TMS' proposal included a base rent of $2,000 per month, total lease term of 50 years, and no ring road maintenance fees.

6.     On August 10, 2001, Aronoff sent TMS an e-mail rejecting the July 25, 2001 proposal and suggesting new proposed terms for a lease of the B-4 parcel. Those terms included base rents that were higher than those proposed by TMS, a thirty-year lease term with two ten-year option periods, and a ring road maintenance fee of $600 per year with annual increases.

7.     On August 29, 2001, TMS sent a letter to Aronoff saying that he agreed to the proposed rent and option periods set forth in the August 10 e-mail but rejecting General Growth's proposed ring road maintenance fee. TMS also proposed new, additional terms, including (1) that the lease include a provision allowing TMS to use Rio West Mall's parking; (2) that TMS

2

have the right to assign the lease to its lender in the event of a default by TMS; (3) that if any lender foreclosed on the landlord (General Growth), that lender's rights would be subordinate to the lease; (4) that TMS have a right of first refusal to buy the B-4 parcel in the event the owner decided to sell it; and (5) that General Growth grant TMS the right of first refusal to lease yet another entirely separate parcel, the nearby "car wash property." In the concluding sentence of the letter, Prakash Sundaram also stated that "If these terms are acceptable, please draft the lease documents, and we will forward them to our attorney and our lender for their comments," implying that if these new, additional terms were not acceptable to General Growth, it should not prepare a lease. The final sentence of the letter also indicates that TMS' lender and its attorney would need to review and comment upon the lease agreement and its provisions before it could be executed by TMS.

8.      The August 10, 2001 letter e-mail was a part of the parties' preliminary negotiations.

9.      These new, additional terms contained in the August 29, 2001 letter were not acceptable to General Growth.

10.     The August 29, 2001 e-mail was not an 'acceptance'.

11.     The August 29, 2001 letter was the first time either of the parties had mentioned rights of assignment, financing terms, or the additional car wash parcel in writing.

12.     On September 24, 2001, Aronoff responded to TMS in an email with a new proposal increasing the amount of rent. TMS rejected that proposal.

13.     Neither Tom Sundaram nor Prakash Sundaram, President and Vice President of TMS respectively, ever decided what Sundaram family company would be the lessee of the B-4 parcel if they had ever executed a lease with General Growth. The Sundarams had vague plans that the

lease would be assigned to or executed by another Sundaram corporation, but that corporation does not even exist right now.

14.     Similarly, the parties never discussed who might sign a lease of the B-4 parcel on behalf of the lessor—General Growth, Rio West Mall LLC, or some other entity.

15.     The alleged contract at issue was for a lease of real property known as the B-4 parcel.

16.     There is no writing which TMS claims constitutes a lease of the car wash property. The parties never even negotiated lease terms for the car wash property.

17.     There is no memorandum in writing signed by General Growth setting forth all the material terms of an alleged contract to lease either the B-4 parcel or the car wash property.

18.     The extent of real property that was the subject matter of the alleged contract is uncertain.

19.     The intended parties to the alleged contract to lease real property were not identified.

20.     Rights of third parties, including in particular TMS's lender, were not discussed or agreed upon.

21.     The writings fail to discuss the acts that constitute default or the consequences of default.

22.     The writings do not discuss allocation of risk for damage to, destruction of, or governmental taking of the property.

23.     The writings fail to provide for allocation of responsibility for taxes, utilities, insurance, or other expenses associated with a lease.

### 2.     Conclusions of Law

1.     There was no unconditional acceptance of any offer, and therefore as a matter of law there was no meeting of the minds sufficient to form a contract to lease any property under New Mexico law.

2.     The alleged contract to lease real estate is one for an interest in real property and therefore falls within the Statute of Frauds

3.     The requirement of the Statute of Frauds that all material terms be clearly set forth in a writing signed by the party to be charged (General Growth) has not been satisfied.

4.     There is no contract between the parties as a matter of law.

5.     The duty of good faith and fair dealing does not apply to mere negotiations.

6.     Because there was no contract between the parties, General Growth did not owe TMS or the Sundarams any duty of good faith and fair dealing. *Sanchez v. The New Mexican,* 106 N.M. 76, 738 P.2d 1321 (1987).

7.     Plaintiff's claims for breach of contract and breach of the duty of good faith and fair dealing fail as a matter of law.

### B.     Promissory Estoppel

#### 1.     Findings of Fact

1.     TMS is a sophisticated company, experienced in commercial real estate transactions.

2.     Tom and Prakash Sundaram are experienced businessmen, both of whom have a college education.

3.     General Growth made no promise to lease the hotel tract to TMS.

4.     TMS knew by September, 2001 at the latest that any lease for the property had to be approved by a committee or other higher authority at General Growth's corporate headquarters.

5.     Based on its own business practice, TMS knew that Jeff Aronoff would have to obtain some form of corporate approval before the parties could enter into a lease.

6.     TMS knew that an interest in land can be transferred only by a signed writing.

5

7.     TMS did not change its position or forebear from taking any action as a result of any alleged promise by General Growth to lease any property.

8.     TMS performed its "due diligence" prior to any alleged promise to lease the land being made, and so could not have performed that "due diligence" in reliance on any promise by General Growth.

9.     General Growth had no reasonable basis to foresee that TMS would not choose to use its own land across the road to build a hotel if it did not get the lease.

10.    TMS undertook no action or forbearance in reliance on Aronoff's alleged promise to take the proposal back to the committee.

11.    General Growth had no reason to know that TMS would forebear from proceeding with plans to develop its own property across the road in reliance on Aronoff's promise to take the proposal back to the General Growth leasing committee.

12.    No injustice would result in failing to enforce any alleged promise to take TMS' proposal back to the leasing committee for a second time. Enforcement of such an alleged promise would merely require Aronoff to present TMS' proposal of $27,000 per year in rent to the committee, which has already chosen to accept Victor Patel's higher offer of $36,000 per year. Therefore, taking TMS' offer back to the General Growth leasing committee would be futile.

13.    TMS proposed to General Growth that it could construct a Courtyard Marriott, Hampton Inn, or Fairfield Inn on General Growth's B-4 parcel.

14.    General Growth never promised to keep confidential the fact that TMS had proposed putting a Courtyard Marriott, Hampton Inn, or Fairfield Inn on General Growth's B-4 parcel.

15.    Even if General Growth had promised to keep TMS' proposal confidential, TMS did not materially change its position in reasonable reliance on such a promise.

6

16.     Enforcement of any alleged promise by General Growth is not required to prevent injustice.

### 2.     Conclusions of Law

1.     General Growth made no enforceable promise.

2.     TMS did not act in reasonable reliance upon any promise by General Growth.

3.     General Growth could not have foreseen any reliance by TMS.

4.     It is not necessary to enforce any promise by General Growth in order to avoid injustice.

5.     Application of promissory estoppel to find a contract is not appropriate in these circumstances.

## II.     AMENDED COMPLAINT -- COUNT V-- UNJUST ENRICHMENT

### A.     Findings of Fact

1.     In hopes of completing a commercial transaction for lease of real property, TMS volunteered to General Growth an idea of how General Growth could use General Growth's land. General Growth did not solicit TMS to provide development ideas for the property.

2.     General Growth had no obligation to accept TMS's proposal to lease the property.

3.     General Growth obtained a better offer for the property, including higher rent, from Victor Patel.

4.     It is not inequitable for a landowner to seek the highest possible rent for his property.

5.     TMS can place no dollar value on the purported "due diligence" it did to determine if its proposal was feasible.

6.     General Growth did not ask TMS to perform this "due diligence."

7.     Valerie Worthen ("Worthen"), the manager of Rio West Mall, provided Prakash Sundaram with information that she obtained regarding the hotel property from the public

records in the County Clerk's office. This included information that a dike easement had been vacated.

8.      General Growth did not ask TMS to develop a plan for use of General Growth's property.

9.      Prakash Sundaram, Vice President of TMS, volunteered to Valerie Worthen, manager of Rio West Mall, the idea of putting a hotel on an outparcel of the mall.

10.     Ms. Worthen did not promise Prakash Sundaram that she would not disclose to third parties that someone was interested in putting a hotel on the property.

11.     Victor Patel and his family operate hotels in the Gallup, New Mexico area. TMS and the Sundarams view Patel as a competitor.

12.     Patel opened a Ramada Ltd. Hotel on an outparcel of the Rio West Mall in 1999. The Ramada parcel is contiguous with the B-4 parcel at issue in this case.

13.     Well before beginning operation of his Ramada Ltd., Patel had already identified parcel B-4 as a good site to build additional units to his Ramada hotel or for construction of a new hotel. Patel came to the decision on his own that he wanted to put a hotel on the property.

14.     No one from General Growth told Patel that TMS was interested in leasing the hotel property.

15.     Patel's decision to put another hotel on the hotel site was based on his 30 years of experience in the hotel business.

16.     After expressing to Valerie Worthen his interest in the B-4 parcel, Patel found out that there was a competing offer for a hotel on the site. However, Worthen never told Patel that the competing offer was for a Hampton Inn hotel or that TMS was interested in the site.

8

17.     Patel and his son did their own independent study on possible franchises, focusing on La Quinta and Hampton Inn. They had called Hampton prior to receiving any information from General Growth about acceptable franchises.

18.     Information about the cost and value of Hampton Inn franchises was publicly available. Information about the potential revenue generated by a Hampton Inn hotel, such as average occupancy rates and revenue per available room, was available to the public and to Patel in publications such as *Lodging* magazine.

19.     There is no evidence in the record that anyone from General Growth ever told Patel that TMS wanted to build a Hampton Inn on the site.

20.     TMS contends that once it proposed to General Growth that the B-4 parcel would be suitable for a hotel, General Growth could not enter into a transaction for lease of the property for a hotel for anyone else besides TMS. It would be inequitable to permit a person to encumber real property belonging to another in this way simply by proposing a use for that property.

21.     The equities of the case do not require imposing a contractual relationship between General Growth and TMS.

### B.     Conclusions of Law

1.     General Growth was not enriched by anything done by TMS.

2.     Any "enrichment" of General Growth was not unjust.

3.     A party cannot volunteer information to another, and then claim entitlement to payment for such information.

4.     It would be inequitable to permit a person to encumber real property belonging to another simply by proposing a use for that property.

## III.     AMENDED COMPLAINT –COUNT II – DUTY TO DISCLOSE

9

### A.   Findings of Fact

1.    TMS and General Growth are both sophisticated business entities with long experience in commercial real estate transactions.

2.    The negotiations between General Growth and TMS were an arm's-length transaction between two sophisticated business entities.

3.    General Growth did not occupy a position of special trust or confidence with respect to TMS.

4.    General Growth had no reason to know that General Growth's internal leasing procedures were a material fact to TMS.

5.    TMS never disclosed its own internal decisionmaking procedures to General Growth.

6.    TMS never informed General Growth that Prakash Sundaram was not authorized to enter into a lease agreement on behalf of TMS without approval from TMS board of directors.

7.    TMS could have inquired about General Growth's internal leasing procedures, but never did.

8.    TMS itself required a board of director's resolution for approval of any lease its Vice President (Prakash Sundaram) negotiated.

9.    General Growth did not intentionally or negligently conceal any material fact from TMS.

10.    TMS could not have "relied" on the belief that General Growth would not use the idea of building a hotel on the B-4 parcel in General Growth's business plan at the time TMS disclosed that idea to General Growth, because TMS voluntarily made that disclosure at the beginning of the negotiations, prior to any representations of any nature by General Growth.

### B.   Conclusions of Law

1.    General Growth had no "duty to disclose" in its dealings with TMS.

2.   There is no fiduciary relationship between TMS and General Growth.

3.   General Growth had no duty to disclose its internal leasing practices to TMS.

4.   General Growth had no duty to disclose that it was negotiating with the Patels.

5.   General Growth did not intentionally or negligently conceal any material fact from TMS.

6.   General Growth did not breach any duty to TMS.

7.   TMS' claims for fraud and negligent misrepresentation fail as a matter of law.


## IV.   AMENDED COMPLAINT–COUNT VI –UNFAIR PRACTICES ACT

### A.   Findings of Fact

1.   The transaction at issue in this case was for a proposed lease of real property.

2.   General Growth committed no unfair or deceptive practices in the course of its communications and negotiations with TMS and the Sundarams.

3.   The Unfair Practices claim was based on all of the remaining allegations in TMS's Amended Complaint.

4.   General Growth was required to defend against all of TMS's allegations to defend itself from the Unfair Practices Claim.

5.   General Growth has reasonably incurred costs and expenses, including attorney' fees, in the amount of $400,000 plus costs in defending against these claims.

### B.   Conclusions of Law

1.   A lease of real property is not a "good" or a "service" that is subject to the New Mexico Unfair Practices Act.  Therefore, the Unfair Practices Act does not apply to this transaction and TMS' claim fails as a matter of law.

2.   General Growth has committed no unfair or deceptive trade practices.

3.     General Growth has prevailed with respect to this unfair practices claim.

4.     TMS' claim under the Unfair Practices Act is groundless because real property is not a good or service under the Act, nor did General Growth make any false or misleading statement. Under NMSA 1978, § 57-12-10©, General Growth is entitled to recover its costs and expenses of defending against these claims, including attorneys' fees.

5.     TMS is liable to General Growth in the amount of $400,000, its reasonable attorney's fees, as well as costs.

## V.     AMENDED COMPLAINT—COUNT III—TRADE SECRETS

### A.     Findings of Fact

1.     TMS volunteered to Valerie Worthen that it wanted to place a hotel on the B-4 parcel at Rio West Mall.

2.     Victor Patel and his family operate hotels in the Gallup, New Mexico area.  TMS and the Sundarams view Patel as a competitor.

3.     Patel opened a Ramada Limited hotel on an outparcel of the Rio West Mall in 1999.  The Ramada parcel is contiguous with the B-4 parcel at issue in this case.

4.     Well before he began operation of his Ramada Limited at Rio West Mall, Patel had already identified parcel B-4 as a good site to build additional units to his existing hotel or for construction of a new hotel.  Patel came to the decision on his own that he wanted to put a hotel on the property.  No one from General Growth told Patel that TMS was interested in leasing the hotel property.

5.     Patel's decision to put another hotel on the hotel site was based on his 30 years of experience in the hotel business.

6.     The idea of putting a hotel on the B-4 parcel at Rio West Mall is not a trade secret because it is readily ascertainable by proper means by other persons.

7.     The idea of putting a Hampton Inn, Courtyard by Marriott, or Fairfield Inn on any property at Rio West Mall is not a trade secret because it is readily ascertainable by proper means by other persons.

8.     TMS assumed the risk that its proposal to lease the land might not be accepted.

9.     General Growth did not promise or agree not to incorporate the hotel idea into its business plan.

10.    To grant the relief sought by TMS would require imposing an equitable servitude on General Growth's property.

11.    General Growth has signed no writing granting any such servitude to TMS.

### B.     Conclusions of Law

1.     An equitable servitude or other right in land cannot be imposed upon another's property by volunteering an idea for a potential use of that property to the owner.

2.     Disclosing a business plan to another for the use of that other's property cannot, without more, give rise to an interest in the other's property.

3.     General Growth was entitled to incorporate the idea of building a high end, full service hotel on the hotel parcel into its overall plan for the Rio West mall.

4.     Absent an agreement, a landowner is not bound to refrain from using an idea volunteered to it for use of its own property.  No such agreement existed in this case.

5.     General Growth has not misappropriated any trade secrets from TMS.

## VI.   REMEDIES

### A.     Findings of Fact

13

1.      The plaintiff in this case is Total Management Systems, Inc. ("TMS"). TMS provides management services to hotels owned by the Sundaram family. TMS does not own any hotels, and the Sundarams never had plans for it to do so.

2.      The Sundarams planned to form a separate corporation to own the hotel they wanted to construct at Rio West Mall. They planned either to have that new entity sign a lease with General Growth, or to have TMS sign the lease and transfer it to the new entity.

3.      The proof of damages offered by TMS for lost profits shows potential damage to the entity that would have owned a hotel on the B-4 parcel. The entity that would have owned the hotel is not the plaintiff in this case, TMS. Because TMS would not have been entitled to any alleged lost profits from a hotel on the B-4 parcel, it is not entitled to claim those alleged profits as damages in this case.

4.      There is no formula by which TMS charges development fees for its services, nor are those fees provided for by contract. Those fees are entirely within the discretion of Tom Sundaram.

5.      TMS has never charged a development fee for any of its services.

6.      If there were a contract between TMS and General Growth, damages would provide a sufficient remedy for its breach.

7.      No writing exists signed by General Growth granting any kind of easement, restrictive covenant, exclusive right to use for a hotel, or other interest in the hotel tract or the car wash tract to TMS.

8.      Any such interest in the real estate at Rio West Mall, including as a restrictive covenant or exclusive right to build a hotel, would be an interest in land subject to the Statute of Frauds.

   **B.      Conclusions of Law**

1.     The remedy at law for the alleged breach of contract being adequate, equitable relief including specific performance should not be granted.

2.     Specific performance of the contract is not an available remedy for the other claims by TMS (breach of covenant of good faith, misappropriation of trade secrets, fraud or negligent misrepresentation, prima facie tort, unjust enrichment, and unfair trade practices).

3.     The writing requirement of the Statute of Frauds must be satisfied before TMS can claim any interest in the B-4 parcel or car wash property, whether as lessee, or in the nature of a restrictive covenant barring use of the land for a hotel by any other party.  No such writing exists, and these claims for relief cannot be used as a substitute for such an agreement.

4.     TMS is not entitled to any relief in the nature of an interest in the property at issue, whether that interest is characterized as a lease or as a restriction on the use of the property by General Growth.

5.     TMS is not entitled to equitable relief.

6.     TMS is not entitled to claim damages for lost profits for a hotel on the B-4 parcel because TMS never would have been entitled to those profits.

7.     TMS is not entitled to claim a development fee because it is not its practice to charge such a fee.

8.     The proof of damages offered by TMS for lost management fees is too speculative to permit an award of damages.

Respectfully Submitted,

MODRALL, SPERLING, ROEHL, HARRIS
& SISK, P.A.

By: _____

John J. Kelly
Valerie V. Vigil
Attorneys for General Growth Properties, Inc.
Post Office Box 2168
Bank of America Centre
500 Fourth Street NW, Suite 1000
Albuquerque, New Mexico 87103-2168
Telephone: 505.848.1800

WE HEREBY CERTIFY that a true and
correct copy of the foregoing pleading
was hand-delivered to all counsel of
record this 20th day of June, 2003.

MODRALL, SPERLING, ROEHL, HARRIS
& SISK, P.A.

By: _____

Valerie V. Vigil

W0306420.DOC

16